# Presidential Authority to Control Export of Hazardous Wastes Under the Export Administration Act of 1979

The Export Administration Act of 1979 gives the President authority to impose controls on the export of hazardous wastes.

Under the 1979 Act, the term "export" includes transactions that have substantial economic consequences, even if they do not directly produce revenue by sales.

October 2, 1980

## MEMORANDUM OPINION FOR THE ACTING LEGAL ADVISER, DEPARTMENT OF STATE

This responds to your request for our opinion whether the Export Administration Act of 1979, Pub. L. No. 96–72, 93 Stat. 503, 50 U.S.C. App. § 2401 (Supp. III 1979), applies to the export of hazardous wastes. The request comes in light of our memoranda for you of April 11, 1980, and of January 30, 1979, finding that the Act provides authority for the President to control the export of hazardous substances.* We now conclude that the Act is equally applicable to the export of hazardous wastes.

Our prior memoranda emphasized the broad range of foreign policy purposes to be served by the executive power to control exports. Our April 11, 1980, memorandum particularly noted the statement in the report of the conference committee that the President's authority to restrict exports " 'to further significantly the foreign policy of the United States . . .' encompasses the full range of U.S. foreign policy goals." H.R. Rep. No. 482, 96th Cong., 1st Sess. 43 (1979) (hereinafter 1979 Conference Report) (quoting § 3(2)(B) of the Act, 50 U.S.C. App. § 2402(2)(B)). These goals are the same for export of all hazardous materials, hazardous substances and hazardous wastes alike. Each implicates United States relations with foreign countries because of the danger to health and safety not only in the importing country but also, because of the very nature of the materials, in other countries as well. For example, if improperly handled, hazardous wastes could enter the air or water supply and from there contaminate the proximate and perhaps the world environment. Even proper handling is no guarantee of sufficient containment of wastes that will be deadly for centuries to

---

*NOTE: The text of the April 11, 1980, memorandum appears in this volume at p. 568, *supra.* Ed.

come. Contamination in the importing country of goods which are subsequently exported could be similarly hazardous to other countries. It is thus appropriate for our foreign policy to demonstrate our concern for the risks attendant to export of hazardous wastes as well as hazardous substances.

Nor do the definitions of the objects of export controls indicate that hazardous substances and hazardous wastes should be treated differently. Section 6(a) of the Act authorizes the President to prohibit or curtail the exportation of any "goods" in pursuit of foreign policy purposes. 50 U.S.C. App. § 2405(a). As defined in § 16(3), "good" includes any "article, material, supply or manufactured product." 50 U.S.C. App. § 2415(3). Just as we earlier concluded that the breadth of this definition indicated that hazardous substances were included, it is our opinion that it is broad enough to include hazardous wastes as well.

The difference between hazardous substances and hazardous wastes lies not in the foreign policy ramifications of export or in the categories of goods subject to control. The only difference is in the export process itself. Hazardous substances are exported by sales to the importing country, and the sales produce direct revenue just as do sales of nonhazardous goods. By contrast, exports of hazardous wastes are not directly revenue producing. Instead, the material is exported by payment to the importing country. The language and the legislative history of the Export Administration Act, however, reflect congressional concern about revenue production through exports. For example, § 2(2) of the Act states the finding by Congress that

> "[e]xports contribute significantly to the economic well-being of the United States and the stability of the world economy by increasing employment and production in the United States, and by strengthening trade balance and the value of the United States dollar, thereby reducing inflation. The restriction of exports from the United States can have serious adverse effects on the balance of payments and on domestic employment. . . ."

50 U.S.C. App. § 2401(2).

The 1979 conference report explained: "[A] large trade deficit weakens the value of the dollar, intensifies inflation, and heightens world economic instability; that poor export performance contributes to the trade deficit; . . . [and] it is in the national interest to place a high priority on exports. . . ." 1979 Conference Report at 43. Because of the procedure of exporting wastes by payments, the question arises whether the Act applies to those exports which are not directly revenue producing.

The Act itself does not define "export." The broad purposes of the Act, however, suggest that a restrictive interpretation would not be appropriate. It may be that exports of hazardous wastes do not directly

produce revenue by sales. Yet it is clear that shipment is sought because of the economic advantage to the exporter, an advantage through less costly disposal of waste materials, which would affect the United States economy in many of the same ways as does revenue production by export. To exclude from the concept of "export" transactions with these substantial economic consequences would frustrate the legislative desire for a consistent and careful export policy.

Certain of the criteria identified in § 6(b) of the Act, 50 U.S.C. App. § 2405(b), for consideration in imposing export controls are concerned with concepts associated with direct revenue production; but this emphasis does not require that the definition of "export" be similarly limited. Even to the extent that these criteria might not be strictly applicable, as phrased, to the export of hazardous wastes, the variance in terminology indicates no intent to limit executive power; for Congress explicitly recognized that not all criteria would be applicable in all cases. In our memorandum of April 11, 1980, we said, "[T]his provision [§ 6(b)] 'did not establish criteria to be met but factors to be considered, and recognized that the President, having considered them, might find one or more of the factors irrelevant to a decision to impose or remove controls,' " quoting S. Rep. No. 169, 96th Cong., 1st Sess. 8 (1979). *See also* 125 Cong. Rec. 19,937 (1979) (Statement of Senator Stevenson on introducing S. 737); H.R. Rep. No. 200, 96th Cong., 1st Sess. 20 (1979). Thus we find in the Act sufficient flexibility to authorize the President to impose controls on the export of hazardous wastes.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
